In the Matter of WARREN Ross et al., Appellants, against LEWIS A. WILSON, as Commissioner of Education of the State of New York, et al., Respondents.

Argued March 11, 1955; decided June 9, 1955.

*Alton R. Erickson* and *Philip A. Erickson* for appellants. I. The board of education acted without statutory authority. (*Matter of Wells,* 64 N. Y. St. Dept. Rep. 227.) II. The acts of the board of education, which have been approved by the Commissioner of Education, violate the provisions of the New York Constitution. (*Carpenter* v. *Wise,* 92 Misc. 246, 174 App. Div. 926; *Mount Sinai Hosp.* v. *Hyman,* 92 App. Div. 270; *People ex rel. Inebriates' Home* v. *Comptroller of City of Brooklyn,* 152 N. Y. 399.) III. The acts complained of were in violation of the Fifth and Fourteenth Amendments of the Constitution of the United States. (*Stuart* v. *Palmer,* 74 N. Y. 183; *Hollenbach* v. *Born,* 238 N. Y. 34; *Gilman* v. *Tucker,* 128 N. Y. 190; *Gardner* v. *Ginther,* 232 App. Div. 296, 257 N. Y. 578.) IV. The courts are clothed with authority to review the determination of the Commissioner of Education. (*Gilman* v. *Tucker,* 128 N. Y. 190; *Matter of Fabricius* v. *Graves,* 254 App. Div. 19; *Matter of O'Connor* v. *Emerson,* 196 App. Div. 807, 232 N. Y. 561; *Schnepel*

v. *Board of Educ. of City of Rochester,* 302 N. Y. 94; *Altschul* v. *Ludwig,* 216 N. Y. 459; *Bull* v. *Stichman,* 298 N. Y. 516.)

*Charles A. Brind, Jr., John P. Jehu, Elizabeth M. Eastman* and *George B. Farrington* for Lewis A. Wilson, Commissioner of Education of the State of New York, respondent. I. Under section 310 of the Education Law, the decision of the Commissioner of Education in this case is both final and conclusive. (*Matter of Cochran* v. *Levy,* 175 Misc. 666, 263 App. Div. 921; *Matter of Levitch* v. *Board of Educ. of City of N. Y.,* 243 N. Y. 373; *Matter of Craig* v. *Board of Educ. of City of N. Y.,* 173 Misc. 969, 262 App. Div. 706; *Matter of Board of Educ. of City of N. Y.* v. *Graves,* 175 Misc. 205, 261 App. Div. 1115; *People ex rel. Hill* v. *Collins,* 34 How. Prac. 336; *People ex rel. Light* v. *Skinner,* 159 N. Y. 162; *People ex rel. Board of Educ. of City of N. Y.* v. *Finley,* 211 N. Y. 51; *Barringer* v. *Powell,* 230 N. Y. 37; *Van Wormer* v. *Mayor of City of Albany,* 15 Wend. 262; *Osterhoudt* v. *Rigney,* 98 N. Y. 222.) II. The construction of the statute by the court below is not only correct but is the only reasonable construction thereof. III. The decision of the commissioner does not raise any State or Federal constitutional question. (*Barringer* v. *Powell,* 230 N. Y. 37; *Adriaansen* v. *Board of Educ., Wayne Co.,* 222 App. Div. 320.) IV. Interpretation of statute by the agency charged with the enforcement is entitled to great weight. (*Matter of Mounting & Finishing Co.* v. *McGoldrick,* 294 N. Y. 104; *Bullock* v. *Cooley,* 225 N. Y. 566; *People ex rel. Werner* v. *Prendergast,* 206 N. Y. 405; *Kings Co. Lighting Co.* v. *City of New York,* 176 App. Div. 175, 221 N. Y. 500; *Matter of McMaster* v. *Owens,* 193 Misc. 284, 275 App. Div. 506; *Board* v. *Hearst Publications,* 322 U. S. 111; *Rochester Tel. Corp.* v. *United States,* 307 U. S. 125.)

*Robert G. Wright* for Board of Education, respondent. I. Petitioners-appellants are bound by the decision of the Commissioner of Education. (*Matter of Jacobson* v. *Board of Educ. of City of N. Y.,* 177 Misc. 809, 265 App. Div. 837, 265 App. Div. 935; *Corbett* v. *Union Free School Dist., Town of Hempstead,* 199 Misc. 930; *Matter of O'Connor* v. *Emerson,* 196 App. Div. 807, 232 N. Y. 561; *Matter of McMaster* v. *Owens,* 192 Misc. 687.) II. This sale was not a gift of public property. (*Gray* v. *Barton,* 55 N. Y. 68; *Pennsylvania Whiskey Distributing Corp.* v. *Bruckman,* 256 App. Div. 781, 282 N. Y. 665; *Matter of Bergerman* v.

*Murphy,* 199 Misc. 1008, 278 App. Div. 388; *Simson* v. *Parker,* 190 N. Y. 19.) III. This sale did not deprive taxpayers of property without due process of law.

VAN VOORHIS, J. The controversy in this proceeding concerns the sale of the schoolhouse which served common school district No. 1 of the Towns of Ellicott and Gerry, in Chautauqua County, before it was superseded by a central school district. This district had been known as the Ross Mills District. In February, 1953, the board of education of the recently formed central school district called a special meeting of the qualified voters of the former common school district to vote upon whether to close the school and sell the school property. Such procedure is required by subdivision 6 of section 1804 of the Education Law, which also provides that if the common school district schoolhouse is sold, the net proceeds be apportioned among the taxpayers of the common school district.

At the special meeting of the common school district called by the board of education in 1953, four propositions were submitted: (1) Should the school of the former common school district be closed? (2) Should the school property be sold to Ross Mills Church of God for $2,000? (3) Should the property be sold to Ross Grange No. 305 for $3,000? (4) Should the property be sold by public auction to the highest bidder? The notice stated that proposition number 1 would be voted upon, " and as many of the succeeding propositions as is necessary to dispose of the property ". At the meeting, the proposal to close the school was carried. A motion was then made but declared out of order that the meeting should next ballot upon whether to sell the school property at public auction to the highest bidder. Then proposition number 2 was presented to the meeting to sell the school property to Ross Mills Church of God for $2,000. It was carried by a vote of 32 to 24. That ended the meeting.

The Commissioner of Education on appeal taken to him pursuant to section 310 of the Education Law sustained this action of the board of education. Thereupon this article 78 proceeding was instituted to review his determination, which was annulled by Special Term but reinstated by the Appellate Division upon the ground that decisions by the Commissioner of Education are final unless purely arbitrary (*Matter of Levitch* v. *Board of Educ.,* 243 N. Y. 373), and that his decision could not thus be

characterized in this instance inasmuch as subdivision 6 of section 1804 of the Education Law, pursuant to which this schoolhouse was sold, does not expressly state that it must be sold to the highest bidder upon the organization of a central school district. The wording of this section differs, it was pointed out, from section 1520 of the Education Law regulating sale of school property upon dissolution of a school district, in which event the Appellate Division said that it is required to be sold '' to the highest bidder at public auction ''.

No question was raised that Ross Grange was financially able to pay $3,000 in cash for the property. In his opinion upholding the action of the school district, the Commissioner of Education placed his decision upon the following ground: '' The type and character of the purchaser of such property after centralization is often a matter of vital import to the rural communities of this State. It is my opinion that the Legislature fully intended to give the voters of component districts a choice as to the type of person or organization whom they wished to have literally in their midst. If the sale were to be mandated to be made to the highest bidder, it may well be that a ' saloon ', filling station or other enterprise undesirable to a specific community might be forced upon it. While I might not necessarily have come to the same conclusion as the majority of the voters in this case, I cannot, as a matter of law, find the exercise of the discretion vested by the statute in such voters to be so unreasonable as to set it aside.'' The commissioner cited section 402 of the Education Law governing the sale of a school building '' Whenever the site of a schoolhouse shall have been changed,'' in which event the qualified voters of the district shall have power to direct the sale of the former site and the buildings thereon '' at such price and upon such terms as they shall deem proper ''. The present situation does not involve a change in site of a school, but the closing of a former district school after the district has been merged into a central school district. Subdivision 6 of section 1804 governs that situation rather than section 402, nor is there greater occasion to apply section 402 than section 1520 which requires that the sale of property of a dissolved school district shall be at public auction. We think that it is not crucial, however, whether section 402 applies to the present situation, and shall decide the issue upon the assumption that section 402 at least supplies some guidance even if it is not

directly controlling. By the same token, section 1502 governing the disposition of school property upon dissolution of a school district may also be regarded in interpreting the meaning of subdivision 6 of section 1804, although its requirement that sale shall be at public auction does not control the present transaction.

In fundamentals, these three sections are not so different as they have been made to sound. All of them contemplate disposal of school property in different contingencies for the best advantage of the school district or its taxpayers. Only the procedure for conducting the sale is different. Even section 1520, which the opinion of the Appellate Division states requires that upon dissolution of the district a school building shall be sold to the highest bidder, does not expressly state that it must be sold to the highest bidder. What that section says is that the property shall be sold " at public auction " which the Appellate Division interpreted as meaning that it must be sold to the highest bidder. Even in that event, the sale would not be required to be to the highest bidder if it were for a use that would constitute a public nuisance or be in violation of valid zoning or other ordinances or regulations.

By the same token whereby the Appellate Division indicated that the statutory requirement that a sale be conducted " at public auction " implies that the property must be struck down to the highest bidder, when subdivision 6 of section 1804 states that it shall be sold with the approval of a majority of the qualified electors voting at a common school district meeting without specifying the method of sale, or when section 402 provides that the sale shall be " at such price and upon such terms as they shall deem proper ", it means that the qualified electors shall use their own best judgment concerning what is the highest price obtainable rather than being required to go through the mechanical procedure of a public auction. In the conduct of private affairs, the problem sometimes arises whether a better price can be obtained upon the sale of property at private sale or at auction. In the case of a public body, such as a school district, the object to be achieved is likewise to realize the best price for the property, although the judgment of the Legislature must be followed concerning whether that purpose is more likely to be accomplished by public auction. But if the Legislature does not require a schoolhouse to be sold at public auction, it

by no means follows from that circumstance that the Legislature intended to authorize the public officials charged with the administration of school property, or even the majority of qualified electors voting at a school district meeting, to sell the property for a smaller amount than has been offered with due formality by a proper purchaser for a lawful use. Subdivision 6 of section 1804 vests broad discretion in a district meeting to determine whether an offer represents the best price obtainable for the property, and the decision of such a meeting will be upheld within wide limits even though it later develops that such a property could have been sold for more money. That is not the circumstance which is presented by the record upon this appeal. Here the higher offer to purchase the schoolhouse was before the district meeting while it undertook to approve a sale at a lower figure. It had been advertised in the notice of the meeting. Sections 402 and 1804 (subd. 6) of the Education Law contemplate that the electors may exercise their judgment and discretion in good faith concerning what is the best price at which a schoolhouse can be sold, but where a higher offer from a responsible bidder is already in their hands, there is not room for the exercise of discretion concerning it. The higher offer must be accepted if it is for a use that may be conducted pursuant to law. If, as was intimated by the Commissioner of Education, a former school site might be used for a filling station, bar and grill or other enterprise undesirable to a specific community, zoning ordinances or other lawful regulatory measures should be adopted. Broad powers are conferred respecting zoning and planning by the town and village enabling acts (Town Law, art. 16; Village Law, art. VI-A). If the use to be made of a former schoolhouse would be detrimental to the local community, it would make no difference whether its discontinuance were due to a dissolution of the school district (Education Law, § 1520) or were caused by a change of site without the formation of a new district (§ 402) or, as in this instance, by the formation of a central school district (§ 1804, subd. 6). It is unlikely that the Legislature intended to vest the board of education and the district meeting with zoning or planning powers in one case and not in another, merely by prescribing a different procedure for conducting the sale. If a particular site is to be devoted to an objectionable use, such use should be prevented by proper zoning or other regulations

regardless of whether the sale was at public auction or otherwise, and regardless of whether the location had been used or acquired for a school. The function of zoning and planning, however important in itself, has not been confided by the Legislature to the educational authorities, and neither the board of education of this central school district nor a majority of the voters at the meeting are empowered to depart from the performance of the functions with which they are charged by law in order to indulge in a different public activity. The Legislature did not confer upon them power of zoning and planning by providing that in certain instances a former schoolhouse shall be sold at public auction and in other instances by private negotiation subject to confirmation by a district meeting. Whichever procedure is prescribed by the Legislature for selling this publicly owned property, it was the duty of the board of trustees and of the district meeting to obtain the best price obtainable in their judgment for any lawful use of the premises. In this respect, their powers and duties are similar to those of trustees. Public officials are, it has been said, '' temporary trustees '' of public property (1 McQuillin on Municipal Corporations [3d ed.], § 1.106, p. 385), and '' It is mandatory upon trustees, with discretionary power of sale, to dispose of trust property upon the most beneficial terms which it is possible for them to secure '' (*Kane* v. *Gerard Trust Co.*, 351 Pa. 191, 196). In *Berner* v. *Equitable Office Bldg. Corp.* (175 F. 2d 218, 221) the United States Court of Appeals said in an opinion by Judge LEARNED HAND: '' It is the duty of every fiduciary to get the best price he can upon the sale of any part of the trust property ''. This fiduciary obligation exists regardless of the method of sale. Neither is the board of education, in this instance, freed from such a fiduciary responsibility due to the circumstance that the price was approved by majority vote at the district meeting. Not only was there a substantial minority who objected, but also there were taxpayers who were not present at the meeting.

Such persons have minority rights which it is as important to democratic processes to protect as is rule by the majority. The majority present at this meeting who voted for the sale stood in somewhat similar fiduciary relationship to nonconsenting property owners as the majority stockholders did in *Godley* v. *Crandall & Godley Co.* (212 N. Y. 121) who were held to be subject to fiduciary obligations to the minority. Stated more

precisely, the majority were limited by statute to utilizing the assets of the school district for educational purposes or to distributing them among the taxpayers. Any other disposition would be beyond the powers conferred upon a school district, and illegal — and would therefore infringe the rights of the minority.

The amount of money involved is small, but the principle is important; the offer which was rejected was to pay 50% more for this schoolhouse than the one which was accepted. Bogert, writing on Trusts and Trustees, says (§ 745): '' Whether the trustee should endeavor to sell by negotiation with possible buyers, or should put the property up at auction, depends upon the circumstances of the individual case. He should use the method which will, considering the place of sale and the type of property for sale, be apt to bring the best price.'' In the present situation, the Legislature has determined that it was not necessary to sell this property at auction, although that procedure would have been permissible, but the latitude allowed in the method of sale was designed to enable these public fiduciaries to adopt the method which in their judgment would bring the best price, and it was their duty to sell at the best price which it brought, not deliberately to select and to favor a buyer at a lower price than was otherwise obtainable. In the same section of Bogert it is also said: '' A power to sell is not equivalent to a power to give away. If the trustee transfers for a merely nominal price or a wholly inadequate price, the sale may be set aside '', citing *Everett* v. *Texas Mexican Ry. Co.* (67 Tex. 430). The learned author adds: '' The principal object of the sale is to obtain the maximum price. The trustee should do his best to secure competitive bidding and to surround the sale with such other factors as will tend to cause the property to sell to the greatest advantage. Just what plan and terms are the best fitted to produce this result in any given case depends on the peculiar characteristics of the property in question and the market conditions ''. Variance in the method of sale does not change the objective, which is to get the best price.

In a recent decision in Pennsylvania, these principles were expressly applied to the duties of public officials in the disposal of public property (*Heilig Bros. Co.* v. *Kohler*, 366 Pa. 72). It was there held that county commissioners who have power to sell county property, commit a breach of duty when they sell

it without learning whether a higher offer earlier made by another is still in force, and that a sale to one who took with notice should be set aside. The existence of this duty does not depend upon the kind of procedure which is established by statute for conducting the sale. In section 802 of Dillon on Municipal Corporations it is said that " Competitive offers or bids have no other object but to insure economy and exclude favoritism and corruption ". The same objects are to be served, even where greater latitude is allowed in the procedure to be followed. At section 811 Dillon states that where a discretion is allowed by statute in the case of municipal bidding, " the body or officer awarding the contract cannot exercise *the discretion entrusted arbitrarily,* and without reason reject the lowest bid and accept a higher one." These statements were made in regard to the letting of contracts for municipal improvements, so that the term " highest " bid should be substituted for " lowest " bid in the case of sale of public property. In a Missouri case this principle was applied, where it was contended that a discretion conferred by statute had been validly exercised in appointing a bank as depositary of school funds, although the successful bank had bid for them at a lower interest rate than another bank. Although the statute in question gave the board authority to exercise a reasonable discretion, the Missouri court interpreted it as intending to avoid " all forms of  *  *  * favoritism " in the selection of banking institutions as depositaries and compelled an award to the highest bidder. (*State ex rel. First Nat. Bank* v. *Bourne,* 151 Mo. App. 104, 121). In another Missouri decision (*State ex rel. Journal Print. Co.* v. *Dreyer,* 183 Mo. App. 463), the award of a public printing contract to a higher bidder was set aside for similar reasons, although discretionary power existed under the statute to select the printer. To similar effect is *Arensmeyer, Warnock, Zarndt, Inc.,* v. *Wray* (118 Misc. 619, per RODENBECK, J.).

In *Cook* v. *City of Racine* (49 Wis. 243, 244–245), the court stated: " The charter of the city of Racine does not require that contracts for building sidewalks shall be let to the lowest bidder, after advertising for proposals therefor. Hence such contracts may be made by private agreement between the city and the person contracting to build them. But, on general principles of law, such contracts must be fairly entered into at reasonable prices, and with due regard to the interests of the

owners of lots chargeable with the cost of the improvement, and, if not so made, courts of equity will give relief to such owners on equitable principles.'' In that case the contract was set aside as let at an unreasonably high price, even in the absence of evidence that another lower bid was available at the time.

The proceeds of sale of this schoolhouse are to be apportioned among the taxpayers of the common school district (Education Law, § 1804, subd. 6). Special Term stated: '' However lofty their motives may have been [the motives of the majority voters at the district meeting], it seems to me they lacked the power to impose their will upon the minority * * * whose property they were attempting to give away, in part at least, without their consent.'' The direct result of what occurred is, in effect, to approve a contribution of $1,000 by the school district to the church. The Commissioner of Education entertained the view that '' full discretion '' is given by this statute to the majority of the voters, '' subject only to the prohibition against ' selling ' for no consideration whatever, and subject further to review in a proper case where the consideration is so nominal as to constitute arbitrary and capricious action.'' This view of the law is incorrect. Neither the district meeting nor the board of education could deliberately accept a lower offer for public property in order to favor one bidder, and thus promote objectives outside of the scope of the Education Law, however commendable such purposes may be. No resolution adopted by the qualified electors at a common school district meeting could authorize or approve the expenditure of school district money under the Education Law for noneducational purposes.

This contribution by a common school district to a particular church is not made in aid of any educational activity conducted by the church, but operates as an outright gift of public funds to a church for its general church purposes. Even if the facts of the case did not present the special situation of the use of public money for the support of a religious establishment (U. S. Const., 1st and 14th Amendts.; cf. N. Y. Const., art. XI, § 4), neither a common school district meeting (Education Law, § 2021) nor the district trustees (§ 1604) are empowered to expend the resources of the school district for other than educational objects. It is true that subdivision 7 of section 2021 empowers the voters to designate school grounds (in contra-

distinction to a schoolhouse) for playgrounds or for agricultural, athletic center or social center purposes — which is not broad enough to include church purposes — and that subdivision 9 empowers the voters to "designate any former schoolhouse and appurtenances, or any part thereof, the title to which is vested in the board, as a public library building", but the very circumstance that the powers of the electorate are limited in this manner accents the incapacity of a district meeting to make grants for noneducational purposes.

Section 414 of the Education Law, entitled "*Use of schoolhouse and grounds out of school hours*," in terms forbids such use "if such meetings, entertainments and occasions are under the exclusive control, and the said proceeds are to be applied for the benefit of a society, association or organization of a religious sect or denomination" (subd. 4). If a license for such an occasional use of a school building is prohibited, a fortiori the same principle would prevent the making, in effect, of a grant of one third of the immediately realizable value of this building in furtherance of such an object.

There is no power in either the board or the voters at a district meeting to pick and choose arbitrarily between purchasers, each desiring to use the property for lawful and proper purposes, or to transfer the funds or other property of the district in aid of one or to the disadvantage of another. In this instance, there is lack of power to use public funds to aid a church by discriminating against the grange. If that can be done, it would be equally legal to permit discrimination between different organizations as purchasers on the basis of their political or religious affiliations or even of their personal popularity. Such favoritism, whether well or ill founded, is not within the scope of the powers of a school district nor is it permitted by law. The record contains nothing to show that the bid of the grange was defective in any respect. Such a showing was necessary if it was to be rejected upon that ground. The principle is analogous to that which was applied in *People ex rel. Coughlin* v. *Gleason* (121 N. Y. 631, 634), which involved bids for public works, wherein it was said: "But here it appears that the relator's bid was next to the highest, *and that there was no question or objection at any time that the lower bids were not formal and regular and made by responsible persons.* It appears beyond

doubt or cavil that the common council arbitrarily rejected the lower bids and accepted the relator's." (Italics supplied.) No defect in the bid by the grange nor question concerning the responsibility of the bidder has been raised upon this appeal.

For the reasons mentioned, we think that there was a total lack of power in the school district to accept an offer of $2,000 from the Church of God of Ross Mills and at the same time to reject an equally bona fide offer of $3,000 from the grange. Although we respect the desire of the commissioner to uphold, if possible, the action taken by the district meeting, since the meeting lacked power to do what it did, the commissioner's confirmation was thus, in a legal sense, purely arbitrary, and thus reviewable in court. In this view of the case, it is not necessary to determine whether this transaction violated section 1 of article VIII of the New York State Constitution. The order appealed from should be reversed and the determinations of the Commissioner of Education and of the board of education approving the sale to the Church of God of Ross Mills should be annulled, with costs to appellants in this court and in the Appellate Division.

The order of the Appellate Division should be reversed and that of Special Term reinstated, with costs in this court and in the Appellate Division.

DESMOND, J. (dissenting). This decision is, we believe, erroneous for at least three reasons:

*First:* It refuses to give effect to a majority vote, at a regularly called and conducted school district meeting, on a question as to which the applicable statutes (Education Law, § 402, subd. 1; § 1804, subd. 6) give, to such a majority, full power of choice.

*Second:* Although one of those statutes (§ 1804, subd. 6, *supra*) forbids respondent board selling the schoolhouse " except with the approval of a majority of the qualified voters * * * present and voting ", and the other statute (§ 402, subd. 1, *supra*) says that such majority " shall have power * * * to direct the sale * * * at such price and upon such terms as they shall deem proper ", this decision restrains respondent board from acting in accordance with the majority vote, and in effect mandates the board to accept a purchase offer which the majority rejected.

*Third:* Although petitioners chose (they could have taken court proceedings instead) to appeal to respondent State Commissioner of Education and although his decision denying appeal is, by section 310 of the Education Law, " final and conclusive, and not subject to question or review in any place or court whatever ", this court gives no effect to the commissioner's decision.

These things are undisputed: that the majority favored the sale to the church for $2,000, that there was no fraud or misconduct, that this was no " gift " but a sale at a price within range of the appraisal obtained by the board, that the applicable statutes *(supra)* contain no requirement of auction sale or acceptance of the highest bid, and that, in the absence of such a statute, there is no such requirement as to sales or purchases by public bodies (see 10 McQuillin on Municipal Corporations [3d ed.], § 28.44; *Simson* v. *Parker,* 190 N. Y. 19; *Matter of Dovel Co.* v. *Village of Lynbrook,* 213 App. Div. 570; *Admiral Realty Co.* v. *City of New York,* 206 N. Y. 110). That the Legislature, in another statute not here applicable (Education Law, § 1520) specifically required sale " at public auction " simply emphasizes the deliberate omission of such requirements from the statutes that apply here.

These statutes, which leave to a decision of a majority of the voters the choice as to price and terms of sale, are old ones, passed by a Legislature which has been concerned with problems of the common schools for many years. The legislators, desiring that the residents themselves, and not the board, should have final say as to whether and how, and for what price and terms, to sell closed schoolhouses, saw no necessity for protecting those residents from themselves by any requirement of auction or highest bid. The reasons why those residents might prefer a more desirable neighbor to a higher price were obvious to the Legislature, and should be obvious to anyone. Since each qualified person had one vote, there was nothing resembling a " fiduciary relationship " between them. When, in the traditional and thoroughly democratic fashion of school district meetings (see Education Law, §§ 416, 1708, 2021, 2023, 2024), the residents chose the lower of two offers, without fraud or other illegality, the question was settled. The commissioner's brief tells us that thousands of sales of " old red schoolhouses " have been carried out in that fashion. Why should we now interfere?

A sampling of rulings in other States shows that there is nothing unusual about selling an abandoned schoolhouse to someone other than the highest bidder (Messick, Discretionary Powers of School Boards, p. 33; Yearbook of School Law [1937], p. 57 [1940], p. 72 [1953], p. 37).

Of course, the final and complete answer to all of appellants' arguments is the State commissioner's decision against appellants. Appellants could have gone to the courts in the first instance (*Matter of O'Connor* v. *Emerson,* 196 App. Div. 807, 810, affd. 232 N. Y. 561). But, when the commissioner, on their appeal to him, applied the statutes exactly as they read, appellants denounced his action as " arbitrary " (*Matter of Levitch* v. *Board of Educ.,* 243 N. Y. 373). (The word " arbitrary ", meaning a baseless, irrational excuse of naked power, seems an inappropriate label for a determination concurred in by eight appellate court justices.) Of course, if a decision becomes " arbitrary " just because someone can be found to dispute it, every decision of the commissioner construing a statute (he has made thousands of such in the past one hundred thirty years) can be fought out, all over again, in the courts. But the statute says that " his decision in such appeals, petitions or proceedings shall be final and conclusive, and not subject to question or review in any place or court whatever " (Education Law, § 310, *supra*). Until now, the courts have consistently obeyed that very old statute and have refused such review (*People ex rel. Hill* v. *Collins,* 34 How. Prac. 336 [1867]; *People ex rel. Light* v. *Skinner,* 159 N. Y. 162, 166; *People ex rel. Board of Educ.* v. *Finley,* 211 N. Y. 51; *Barringer* v. *Powell,* 230 N. Y. 37; *Matter of O'Connor* v. *Emerson, supra; Matter of Levitch* v. *Board of Educ., supra*).

There is not, of course, any issue here as to " Church and State ", and neither the parties, nor the commissioner, nor the courts below, have discussed any such supposed issue.

The order of the Appellate Division should be affirmed, with costs.

CONWAY, Ch. J., FULD and BURKE, JJ., concur with VAN VOORHIS, J.; DESMOND, J., dissents in an opinion in which DYE and FROESSEL, JJ., concur.

Orders reversed, etc.